**AFFIDAVIT OF UNITED STATES SECRET SERVICE CYBER SPECIAL AGENT GARRETT FITZGERALD**

I, Garrett FitzGerald Jr., declare and state the following:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Cyber Special Agent ("CSA") with the United States Secret Service ("USSS") and have been employed as such since March 13, 2019.  Prior to becoming a Cyber Special Agent, I was employed with the United States Secret Service as a Special Agent for approximately four years.  I attended the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia and the United States Secret Service Special Agent Training Course at the James J. Rowley Training Center in Beltsville, Maryland.

2.      I am currently assigned to the Boston Field Office, Digital Evidence Forensic Lab, where I conduct financial crime investigations, including investigations of violations of 18 U.S.C. § 1343 (fraud by wire) and 18 U.S.C. § 1956 (laundering of monetary instruments).  In connection with these investigations, I have conducted or participated in numerous field interviews of suspects, witnesses and victims, electronic and physical surveillance, and have researched financial documents and information relating to cryptocurrency transactions and fiat money transfers between financial institutions.  Through my training and experience, I have become familiar with various financial frauds and schemes such as bank frauds, wire frauds, and mail frauds.

**PURPOSE OF AFFIDAVIT**

3.      I submit this affidavit in support of a Verified Complaint for Forfeiture *in Rem* against the following assets:

  a.      299,457.4 USDC[1], 162.5354 USDT[2], and 6,941.648 TRX[3],seized from a Binance account with user ID XXXX3903 on dates ranging from on or about January 12, 2024 through January 25, 2024 ("BINANCE ACCOUNT-1"); and,

  b.      1,455,143.462248 USDT, 3,032.1689461 SOL[4], 67.79400436 BNB[5] 95,336.8670150 TRX, 13,703.955431 ADA[6], and 0.54151495 ETH[7] seized from a BINANCE account with user ID XXXX7849 on dates ranging from on or about January 12, 2024 through January 19, 2024 ("BINANCE ACCOUNT-2")

(collectively, the "Defendant Cryptocurrency" and the "BINANCE ACCOUNTS").

    4.      As set forth below, there is probable cause to believe that a portion of the Defendant Cryptocurrency is traceable to and/or involved in a "Pig Butchering" fraud scheme, described in further detail below, that targeted a 51-year old resident of Massachusetts.  The scheme duped a resident of Massachusetts into transferring over $400,000 from his personal bank account into two cryptocurrency platforms and from there into fraudulent investment platforms/cryptocurrency exchanges.

---

[1] USD Coin ("USDC") is a cryptocurrency intended to have a value very close to one US dollar and may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies.

[2] Tether ("USDT") is a cryptocurrency intended to have a value very close to one US dollar and may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies.

[3] Tronix ("TRX") is a cryptocurrency utilized by the Tron blockchain and may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies.

[4] Solana ("SOL") is a cryptocurrency utilized by the Solana blockchain and may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies.

[5] Binance coin ("BNB") is a cryptocurrency established by the Binance cryptocurrency exchange and may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies.

[6] ADA ("ADA") is a cryptocurrency utilized by the Cardano blockchain and may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies.

[7] Ether ("ETH") is a cryptocurrency utilized by the Ethereum blockchain and may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies.

5.      Accordingly, there is probable cause to believe that the Defendant Cryptocurrency in the BINANCE ACCOUNTS, includes proceeds traceable to a violation of 18 U.S.C. § 1343 (wire fraud) and are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).  Additionally, as set forth below, there is probable cause to believe that the Defendant Cryptocurrency is also property involved in a violation of 18 U.S.C. § 1956 (laundering of monetary instruments) and is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).  The Defendant Cryptocurrency was seized pursuant to seizure warrants issued in the District of Massachusetts.

6.      This affidavit is based on my personal knowledge, information provided by other law enforcement officers and government employees, and information gathered during this investigation including interviews of witnesses, the review of documents, and conversations with other law enforcement officers.  This affidavit is not intended to set forth all of the information that I have learned during this investigation, but includes only the information necessary to establish probable cause for the requested seizure warrants.

## FORFEITURE AUTHORITY

7.      As set forth below, I submit that probable cause exists to believe that up to 15,000 USDT of the Defendant Cryptocurrency held in BINANCE ACCOUNT-1 and up to 48,223 USDT of the Defendant Cryptocurrency held in BINANCE  ACCOUNT-2 are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it is property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1343 (wire fraud). Pursuant to 18 U.S.C. § 1961(1), as incorporated by 18 U.S.C. § 1956(c)(7)(A), violations of 18 U.S.C. § 1343 are a "specified unlawful activity" within the meaning of 18 U.S.C. § 981(a)(1)(C).

8.       Additionally, I submit that probable cause exists to believe that the entirety of the Defendant Cryptocurrency  is subject to forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(A)), because the Defendant Cryptocurrency is property, real or personal, involved in a transaction or attempted transaction in violation of section 18 U.S.C. § 1956(a)(1)(B)(i) and/or 18 U.S.C. § 1956(h) or property traceable to such property.  It is a violation of 18 U.S.C. § 1956(a)(1)(B)(i) (laundering of monetary instruments) to conduct or attempt to conduct a financial transaction knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. It is a violation of 18 U.S.C. § 1956(h) to conspire to engage in the offense of money laundering.

9.       Under 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction in violation of [18 U.S.C. § 1956], or any property traceable to such property" is subject to forfeiture to the United States.  The First Circuit has found that the term "property involved" means both tainted and untainted property which have been comingled, so long as the "comingling was done to facilitate money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i)."  *U.S. v. McGauley*, 279 F.3d 62, 76 (1st Cir. 2002); *see also U.S. v. Lyons*, 870 F. Supp. 2d 281, 285-86 (D. Mass. 2012).

10.       Pursuant to 18 U.S.C. § 1956(a)(1)(B)(i), a person commits the crime of money laundering when "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity" and does so knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful

4

activity…."  Pursuant to 18 U.S.C. § 1956(h), it is also a crime to conspire to commit money laundering.

## BACKGROUND ON CRYPTOCURRENCY

11.     Based on my training, research, education, and experience, I am familiar with the following relevant terms and definitions:

12.     Cryptocurrency, a type of virtual currency, is a decentralized, peer-to-peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies.[8]  Some examples of cryptocurrency are Bitcoin, Litecoin, and Ether.  Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers.  Although not usually stored in any physical form, public and private keys (described below) used to transfer cryptocurrency from one person or place to another can be printed or written on a piece of paper or other tangible object.  Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange, or through other intermediaries.  Generally, cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network.  Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction.[9]  Cryptocurrency is not illegal in the United States.

13.     Tether ("USDT") is an alternative type of cryptocurrency or altcoin token. Payments or transfers of value made with Tether are recorded in the blockchain network, but

---

[8] Fiat currency is currency issued and regulated by a government such as the U.S. Dollar, Euro, or Japanese Yen.
[9] Some cryptocurrencies operate on blockchains that are not public and operate in such a way to obfuscate transactions, making it difficult to trace or attribute transactions.

unlike decentralized cryptocurrencies like Bitcoin, Tether has some anatomical features of centralization. One centralized feature is that Tether is a stablecoin or a fiat-collateralized token that is backed by fiat currencies, or currencies issued by governments like the dollar and euro. Tether is backed with a matching one-to-one fiat amount, making it much less volatile than many other cryptocurrencies, including Bitcoin. Due to Tether's stable nature, wallet holders typically use a fundamental strategy to convert their cryptocurrency holdings into Tether to hedge their receipt or earnings value so it is not affected by the rest of the volatile cryptocurrency market.

14.     Cryptocurrency is stored in a virtual account called a wallet. Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency. A public key or address is akin to a bank account number, and a private key is akin to a PIN number or password that allows a user the ability to access and transfer value associated with the public address or key. To conduct transactions on a blockchain, an individual must use the public address (or "public key") and the private address (or "private key"). A public address is represented as a case-sensitive string of letters and numbers, 26-36 characters long. Each public address is controlled and/or accessed through the use of a unique corresponding private key—the cryptographic equivalent of a password or PIN—needed to access the address. Only the holder of an address' private key can authorize any transfers of cryptocurrency from that address to another wallet address.

15.     Although cryptocurrencies such as Bitcoin, Tether, and Ethereum have legitimate uses, cryptocurrency can also be used by individuals and organizations for criminal purposes such as money laundering, and is an oft-used means of payment for illegal goods and services. By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track transactions.

16.     Exchangers and users of cryptocurrencies store and transact their cryptocurrency in a number of ways, as wallet software can be housed in a variety of forms, including on a tangible, external device ("hardware wallet"), downloaded on a PC or laptop ("desktop wallet"), with an Internet-based cloud storage provider ("online wallet"), as a mobile application on a smartphone or tablet ("mobile wallet"), printed public and private keys ("paper wallet"), and as an online account associated with a cryptocurrency exchange.  Because these desktop, mobile, and online wallets are electronic in nature, they are located on mobile devices (*e.g.*, smart phones or tablets) or at websites that users can access via a computer, smart phone, or any device that can search the Internet.  Moreover, hardware wallets are located on some type of external or removable media device, such as a USB thumb drive or other commercially available device designed to store cryptocurrency (*e.g.*, Trezor, Keepkey, or Nano Ledger).  In addition, paper wallets contain an address and a QR code[10] with the public and private key embedded in the code.  Paper wallet keys are not stored digitally.  Wallets can also be backed up into, for example, paper printouts, USB drives, or CDs, and accessed through a "recovery seed" (random words strung together in a phrase) or a complex password.  Additional security safeguards for cryptocurrency wallets can include two-factor authorization (such as a password and a phrase).  I also know that individuals possessing cryptocurrencies often have safeguards in place to ensure that their cryptocurrencies become further secured in the event that their assets become potentially vulnerable to seizure and/or unauthorized transfer.

17.     Cryptocurrency "exchangers" and "exchanges" are individuals or companies that exchange cryptocurrencies for other fiat currencies and cryptocurrencies, including U.S. dollars, bitcoin, and Tether.  According to Department of Treasury, Financial Crimes Enforcement

---

[10] A QR code is a matrix barcode that is a machine-readable optical label.

Network ("FinCEN") Guidance issued on March 18, 2013, virtual currency administrators and exchangers, including an individual exchanger operating as a business, are considered money services businesses.[11]  Such exchanges and exchangers are required to register with FinCEN and have proper state licenses (if required under applicable state law).  From my training and experience, I know that registered money transmitters are required by law to follow Bank Secrecy Act ("BSA") anti-money laundering ("AML") regulations, "Know Your Customer" ("KYC") protocols, and other verification procedures similar to those employed by traditional financial institutions.  For example, FinCEN-registered cryptocurrency exchangers often require customers who want to open or maintain accounts on their exchange to provide their name, address, phone number, and the full bank account and routing numbers that the customer links to an exchange account.  As a result, there is significant market demand for illicit cryptocurrency-for-fiat currency exchangers, who lack AML or KYC protocols and often also advertise their ability to offer customers stealth and anonymity.  These illicit exchangers routinely exchange fiat currency for cryptocurrencies by meeting customers in person or by shipping cash through the mail.  Due to the illicit nature of these transactions and their customers' desire for anonymity, such exchangers are frequently able to charge a higher exchange fee, often as high as 9–10% (in contrast to registered and BSA-compliant exchangers, who may charge fees as low as 1–2%).

18.     Binance Capital Management Co., Ltd.  ("BINANCE") is a cryptocurrency exchange and custodian that allows users to buy, sell and store digital assets.  They hold a Money Service Business Registration in the United States.  Their registration shows an address

---

[11] *See* "Application of FinCEN's Regulations to Person Administering, Exchanging, or Using Virtual Currencies," *available at* https://www.fincen.gov/resources/statutes-regulations/guidance/application-fincens-regulations-persons-administering.

of P.O. Box 472, Harbour Place, 2nd Floor, North Wing, 103 South Church Street, George

Town, Grand Cayman, KY1-1106.

19.     Some companies offer cryptocurrency wallet services which allow users to

download a digital wallet application onto their smart phone or other digital device. A user

typically accesses the wallet application by inputting a user-generated PIN code or password.

Users can store, receive, and transfer cryptocurrencies via the application; however, many of

these companies do not store or otherwise have access to their users' funds or the private keys

that are necessary to access users' wallet applications. Rather, the private keys are stored on the

device on which the wallet application is installed (or any digital or physical backup private key

that the user creates). As a result, these companies generally cannot assist in seizing or otherwise

restraining their users' cryptocurrency. Nevertheless, law enforcement could seize

cryptocurrency from the user's wallet directly, such as by accessing the user's smart phone,

accessing the wallet application, and transferring the cryptocurrency therein to a law

enforcement-controlled wallet. Alternatively, where law enforcement has obtained the recovery

seed for a wallet (see above), law enforcement may be able to use the recovery seed phrase to

recover or reconstitute the wallet on a different digital device and subsequently transfer

cryptocurrencies held within the new wallet to a law enforcement-controlled wallet.

20.     Intermediary wallets are typically private wallets or non-exchange wallets that

obfuscate transactions on the blockchain. Intermediary wallets support the movement of illicitly

obtained funds as they help to conceal and disguise the source of the cryptocurrency exchanged

for fiat currency by layering and severing straight line coordinates of transaction activity on the

blockchain to cash-out exchanges.

## PROBABLE CAUSE

21.     This investigation was initiated from a fraud report received by the USSS Boston

Field Office from Victim 1, a 51-year-old Massachusetts resident.  In January 2023 Victim 1 fell

victim to a burgeoning fraud scheme known as "Pig Butchering," which resulted in a total loss of

over $400,000 to Victim 1.

22.     "Pig Butchering" is a type of romance scam, or confidence scam, that convinces

victims to invest in non-existent cryptocurrency trading platforms.  Romance scams target

persons looking for romantic partners or friendships on professional networking websites, dating

websites, and other social media platforms.  The scammers may create profiles using fictitious or

fake names, locations, images, and personas, allowing the scammers to cultivate relationships

with prospective romance scam victims.  Romance scams aim to use the fictitious relationship to

obtain money or induce victims to conduct financial transaction on behalf of the scammers.  In

this case, and as explained in further detail below, efforts to defraud Victim 1 were evident as

three different online personas contacted Victim 1 within the span of approximately two months

all using similar tactics and some even using the same wallet addresses to receive Victim 1's

funds.

### The Scheme to Defraud - 1

23.     On or about January 20, 2023, Victim 1 was contacted on the professional

networking platform LinkedIn, by an individual claiming to be Hung Hee Yeo, going by the

name "EMILY," who purported to live in California working as a chief risk officer at a venture

capital firm, with a background in macroeconomics.  Their communications soon shifted to the

WhatsApp communication platform, which Victim 1 accessed using his Apple iPhone.  EMILY

communicated with Victim 1 using the phone number +X-XXX-XXX-9210.  Their frequent

communications initially discussed family, cuisine, and culture; then after a short time EMILY began discussing the economy, inflation, investments, and trading in gold futures. She then invited Victim 1 to join in trading gold futures. Victim 1 provided investigators with records and screenshots of his communications with EMILY, along with records of his personal financial accounts.

24.     One of the many statements EMILY made to convince Victim 1 to join the trade was on or about January 30 2023, when EMILY stated: "Under the current economic situation, international gold futures are more reliable than traditional financial management! ... In the era of financial and political instability and crisis, a better choice is to invest in futures..."

25.     EMILY provided Victim 1 step-by-step instructions to download the Crypto.com app onto his Apple iPhone, create an account and fund the account with wire transfers of fiat currency from his personal financial accounts, then convert these funds into cryptocurrency. Next, EMILY provided detailed instructions for Victim 1 to install the Coinbase wallet app onto his iPhone, create an account and transfer cryptocurrency from his Crypto.com account into his Coinbase wallet account.

26.     Following this, EMILY instructed Victim 1 to search the Apple App Store for the app "FX6," install the app, create an account and use this app to connect to the website "Sundell" with address www.sundell-fx.com. EMILY instructed Victim 1 to create an account with "Sundell," claiming this was a cryptocurrency platform and the "FX6" app was a futures exchange trading platform. Following this, EMILY instructed Victim 1 to fund his account with "Sundell" by transferring the cryptocurrency in his Coinbase wallet into a wallet address displayed on the "Sundell" platform.

27.     After Victim 1 had funded his account on the "Sundell" platform, EMILY would inform him of "trading opportunities" in gold futures on the "Sundell" platform.  To participate in these trading opportunities EMILY instructed Victim 1 to conduct a series of steps on the "Sundell" platform, which led Victim 1's account value to appear to increase.  After Victim 1's account value appeared to increase he believed this was a legitimate investment.

28.     After each "trading opportunity," EMILY would discuss Victim 1's profits and EMILY made the following statements regarding Victim 1's performance during the most recent trading opportunity:

29.     On or about February 7, 2023, EMILY stated: "Today's profit is 6360."

30.     On or about February 13, 2023, EMILY stated: "The profit this time is 6K" and "Haha, next time the profit will be doubled!..."

31.     Intermittently, EMILY instructed Victim 1 to send additional funds to the "Sundell" platform claiming Victim 1 would earn higher profits with the additional funds. Victim 1 made five (5) cryptocurrency transfers to the "Sundell" platform at the direction of EMILY between February 7, 2023 and March 17, 2023, totaling approximately 76 ETH and 71,000 USDT, as shown in Figures 1 and 2, *infra* at pp. 22-23.

32.     Victim 1 provided investigators with screenshots of his account on the "Sundell" platform showing trading histories, profits, and account balances.  One image provided by Victim 1 appears to show that on or about March 27, 2023, Victim 1's account balance on the "Sundell" platform was over $400,000.

33.     On March 27, 2023, Victim 1 attempted to withdraw funds from the "Sundell" platform, which the platform denied and demanded Victim 1 pay a "... 30% personal income tax ..." before withdrawing his funds.  Victim 1 contacted EMILY asking for assistance and after

two days of conversation EMILY stated: "You might as well call the police now and find your poor FBI daddy", "lol", and "Hurry up and call the police, poor little baby."

34.     It was at this point that Victim 1 became aware of the scheme to defraud him and filed a fraud report with law enforcement.

35.     On May 8, 2023, I conducted a search of the Apple App Store and did not identify an app hosted on this Apple platform matching the name "FX6" or the description provided by Victim 1.  On the same date I also conducted an internet search of the "FX6" app and identified a blog posting reporting a scam using the "FX6" app utilizing similar tactics to those employed to defraud Victim 1.  Lastly, a law enforcement database search revealed over 10 separate fraud reports detailing scams utilizing the "FX6" app resulting in millions of dollars in victim losses.

36.     Based on my training and experience, the discrepancies identified above for the "FX6" app are not typical for legitimate mobile phone applications.

37.     On May 8, 2023, I conducted an internet search for www.sundell-fx[.]com and located the website Victim 1 indicated he used to access his "Sundell" account.  Based on my training and experience, as well as conversations with other investigators familiar with investment platforms, it is expected that a legitimate investment platform would display the location of the company headquarters, company staff information, a careers page showing employment opportunities, links to social media pages associated with the platform, and links to a company blog.

38.     Further examination of this website identified several discrepancies, which based on my training and experience, indicate that this website does not appear to be a legitimate investment platform.  These discrepancies are indicated below.

39.     When navigating to this website I did not identify: an address of the company headquarters, any employees currently working for this platform, a careers page showing ways to apply for employment with the platform, links to a social media presence, or a current company blog.

40.     When visiting this website, I also observed multiple instances of misspelled words, sentences containing unnecessary duplicate words and inconsistent capitalization use. Additionally, I identified broken links within this website leading to webpages only showing the text: "404 NOT FOUND."  This is not indicative of a legitimate investment platform.

41.     Upon further inspection of this website, it appears to claim to have an application compatible with mobile Apple devices, but after searching the Apple App Store later the same day I did not identify a mobile application within the Apple platform associated with www.sundell-fx.com.

42.     An additional internet search showed a blog post describing the "Sundell" website as a scam.

43.     Finally, a search of law enforcement databases yielded multiple fraud reports identifying the "Sundell" website as a scam that led to millions of dollars in victim losses.

44.     Accordingly, I have probable cause to believe that Victim 1 was fraudulently induced to transfer funds to the scam platform "Sundell" described above, *i.e.*, wire fraud, in violation of 18 U.S.C. § 1343.

**The Scheme to Defraud – 2**

45.     In March 2023, Victim 1 was again contacted on LinkedIn, this time by an individual claiming to be Teng Jiali, going by the name "ALICE," who purported to live in California working as a jewelry design director at the Bulgari company.  Their communications

14

soon shifted to the Line communication platform, which Victim 1 accessed using his Apple

iPhone.  Their frequent communication initially discussed employment and culture; then after a

short time ALICE began discussing cryptocurrency investing and her belief that cryptocurrency

is a more secure means of storing assets than traditional banking systems.  ALICE discussed

learning about finances and investments from a "professor," and offered for Victim 1 to join her

in cryptocurrency futures trading.  Victim 1 provided investigators with records and screenshots

of his communications with ALICE, along with records of his personal financial accounts.

46.     Similar to the scheme perpetrated by EMILY, ALICE also instructed Victim 1 to

fund his Crypto.com account with wire transfers from his personal financial accounts, then

convert these funds into cryptocurrency.  On March 17, 2023, ALICE instructed Victim 1 to use

the browser within his Coinbase wallet app to visit the website "CPL" with address

www.cplmok[.]com, claiming it was a cryptocurrency platform and instructed Victim 1 to create

an account.  Then ALICE instructed Victim 1 to use the wallet address shown on this "CPL"

platform to fund his "CPL" account with cryptocurrency from his Crypto.com and Coinbase

wallet accounts.

47.     During their conversations, Victim 1 told ALICE about the scam EMILY

conducted and ALICE indicated she did not know EMILY.  The wallet address associated with

ALICE (ending in fb990), however, matches one of the wallet addresses associated with EMILY,

further showing a link between these two schemes.

48.     Similar to the scheme perpetrated by EMILY, ALICE would also inform Victim 1

of "trading opportunities" in cryptocurrency futures on the "CPL" platform and instructed Victim

1 to conduct a series of steps on this platform which led Victim 1's account balance to appear to

increase.  After a trading opportunity on March 17, 2023, ALICE made the following statements

regarding Victim 1's performance during the trading opportunity: "Yeah. You made 200 dollars."

49.     Shortly following this, ALICE requested Victim 1 deposit additional funds into his "CPL" platform account claiming he could make higher profits in each transaction.  On March 17, 2023, ALICE stated: "For example, if you have 300k, I will take you to trade 60S-30%, then your profit can be 300K multiplied by 0.3 profit, that is 90K."

50.     Victim 1 provided investigators with screenshots of his account on the "CPL" platform showing trading histories, profits, and account balances.  One image provided by Victim 1 appears to show that Victim 1's account balance on the "CPL" platform was over $6 million.

51.     On March 29, 2023, Victim 1 attempted to make a withdrawal from his account on the "CPL" platform which the platform denied and demanded Victim 1 pay a series of fees and taxes before withdrawing his funds.  Victim 1 contacted ALICE requesting assistance and she further encouraged him to comply with the platform's demands.  Victim 1 made additional payments to the "CPL" platform, unsuccessfully attempting to unfreeze and withdraw his funds. After several more days of unsuccessfully withdrawing funds, Victim 1 realized this was a scam and filed a fraud report with law enforcement.

52.     In total, Victim 1 made six (6) cryptocurrency transfers to the "CPL" platform at the direction of ALICE between March 20, 2023 and April 11, 2023, all transferred to the wallet address ending in fb990, totaling approximately 30 ETH, 126,000 USDC and 29,000 USDT, as shown in Figures 1 and 2, *infra* at pp. 22-23.

53.     On May 9, 2023, I conducted an internet search for www.cplmok[.]com and located the website Victim 1 indicated he used to access his "CPL" account.  Based on my

training and experience, as well as conversations with other investigators familiar with investment platforms, it is expected that a legitimate investment platform would display the location of the company headquarters, a contact email address or phone number, company staff information, a careers page showing employment opportunities, links to social media pages associated with the platform, and links to a company blog.

54.    Further examination of this website identified several discrepancies, which based on my training and experience, indicate that this website does not appear to be a legitimate investment platform.  These discrepancies are indicated below.

55.    When navigating to this website I did not identify: an address of the company headquarters, any contact email address or phone number, any employees currently working for this platform, a careers page showing ways to apply for employment with the platform, links to a social media presence, or a current company blog.

56.    Upon inspecting this website, I did not identify platform press releases, information for developers or a compliance section.  Additionally, misaligned text was identified on this website.

57.    Upon further inspection of this website it appears to claim having an application compatible with mobile Apple devices, but after searching the Apple App Store later the same day I did not identify a mobile application within the Apple platform associated with www.cplmok.com.

58.    An additional internet search of this website showed a blog post describing the "CPL" website as a scam.

59.    Finally, a search of law enforcement databases yielded a fraud report identifying the "CPL" website as a scam that led to over $1 million in victim losses.

60.     Accordingly, I have probable cause to believe that Victim 1 was fraudulently induced to transfer funds to the scam platform "CPL" described above, *i.e.*, wire fraud, in violation of 18 U.S.C. § 1343.

**The Scheme to Defraud - 3**

61.     In March 2023 Victim 1 was also contacted on LinkedIn by an individual claiming to be Tien IAN, who purported to live in California working in the financial sector. Their communications soon shifted to the Line communication platform, which Victim 1 accessed using his Apple iPhone.  Their frequent communication initially discussed current economic conditions and transitioned to cryptocurrency investing.  After a point IAN began communicating with Victim 1 in simplified Chinese which Victim 1 confirmed he is able to understand, read and write, and further that Victim 1 lived in China before moving to the United States.  Victim 1 provided investigators with records and screenshots of his communications with IAN translated into English, along with records of his personal financial accounts.

62.     IAN discussed cryptocurrency investing and invited Victim 1 to join in the trading of cryptocurrencies, utilizing the website "DOEX" with address "www.doextras.com" claiming it was a cryptocurrency platform.  IAN lured Victim 1 into this investing "opportunity" by claiming he could start with a small investment and watch it grow quickly.  Similar to the tactics utilized by EMILY and ALICE, IAN instructed Victim 1 to create an account at "DOEX" and fund it with cryptocurrency from Victim 1's Crypto.com account.

63.     Victim 1 told IAN he was scammed by two other individuals resulting in a loss over $400,000 and IAN promised Victim 1 that if he trusted her, he could make back the money he lost.  Similar to the tactics utilized by EMILY and ALICE, IAN instructed Victim 1 to follow a series of steps on the "DOEX" platform to conduct trades which led Victim 1's account

balance to appear to increase.  Afterward, IAN would request Victim 1 to send additional funds to the platform.

64.     Victim 1 provided investigators with screenshots of his account on the "DOEX" platform showing trading histories, profits, and account balances.  One image provided by Victim 1 appears to show that Victim 1's account balance on the "DOEX" platform was over $24,000.

65.     Shortly thereafter Victim 1 attempted to make a withdrawal from his account on the "DOEX" platform which the platform denied.  Victim 1 contacted IAN for assistance in this withdrawal and during their conversation IAN resumed sending messages in English and on April 25, 2023 IAN stated: "Sorry, I lied to you. But I want to cheat you more. If only you hadn't been cheated by 450k, I could cheat you more money, and even make you bankrupt. China people living in the United States deserve to die. I lied to you to increase the economy of our motherland."

66.     In total, Victim 1 made two (2) cryptocurrency transfers to the "DOEX" platform at the direction of IAN between April 3, 2023 and April 10, 2023, both transferred to the wallet address ending in b982, totaling approximately 20,000 USDC, as shown in Figures 1 and 2, *infra* at pp. 22-23.

67.     On May 9, 2023, I conducted an internet search for www.doextras[.]com and located the website Victim 1 indicated he used to access his "DOEX" account.  Based on my training and experience, as well as conversations with other investigators familiar with investment platforms, it is expected that a legitimate investment platform would display the location of the company headquarters, a contact email address or phone number, company staff

information, a careers page showing employment opportunities, links to social media pages associated with the platform, and links to a company blog.

68.     Further examination of this website identified several discrepancies, which based on my training and experience, indicate that this website does not appear to be a legitimate investment platform.  These discrepancies are indicated below.

69.     When navigating to this website I did not identify: an address of the company headquarters, a contact email address or phone number, any employees currently working for this platform, a careers page showing ways to apply for employment with the platform, links to a social media presence, or a current company blog.

70.     Upon inspection this website I did not identify platform press releases or information for developers.  Additionally, misaligned text was identified on this website.

71.     Upon further inspection of this website, it appears to claim having an application compatible with mobile Apple devices, but after searching the Apple App Store later the same day I did not identify a mobile application within the Apple platform associated with this website.

72.     Finally, a search of law enforcement databases yielded multiple fraud reports identifying the "DOEX" website as a scam leading to significant victim losses.

73.     Accordingly, I have probable cause to believe that Victim 1 was fraudulently induced to transfer funds to the scam platform "DOEX" described above, *i.e.*, wire fraud, in violation of 18 U.S.C. § 1343.

**<u>The Flow of Funds</u>**

74.     Through subsequent analysis, law enforcement traced the cryptocurrency that Victim 1 transferred from his Crypto.com and Coinbase wallet accounts to BINANCE

ACCOUNT-1 and BINANCE ACCOUNT-2.  This property was traced based on the last in-first out ("LIFO") accounting principle, which assumes that the last, or most recent, incoming assets are the first expended or sent out.  *See United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1160 (2d Cir. 1986) (government can establish prima facie case for forfeiture by relying on either the "last-in, last-out" approach or the "last-in, first-out" approach).

75.     The 13 transfers out of Victim 1's accounts at Crypto.com and Coinbase wallet were a result of the efforts of scammers utilizing three different personas and are reflected in Figures 1 and 2 below, with times shown in UTC[12]:

---

[12] UTC is Universal Time Coordinated, also known as Coordinated Universal Time or Greenwich Mean Time.

| Date: 02/07/2023 20:04:59 |
|---|
| Amount ETH: 17.820677571264795 |
| Sent to wallet address: 0xFfA2930558B5904E0d73580E349389fdFC827297 (Wallet ending in 7297) |
| Transaction Hash: 0x6e70e997a1ebed1b86944672d116bd221562dc8d628de7ae5b581f0c4021e2f7 |
| |
| Date: 03/01/2023 20:08:23 |
| Amount USDT: 71,121.51 |
| Sent to wallet address: 0xCA85217Ed105cCba749A024bF1869f7dBb27576a (Wallet ending in 576a) |
| Transaction Hash: 0xa3c40a0c977162acd8e9ef4153e8c5a78062e1adb70d8d4697f4afd767f72218 |
| |
| Date: 03/11/2023 03:10:59 |
| Amount ETH: 13.297284384387375 |
| Sent to wallet address: 0xECD74463bCD50413d071Bb9B129564A876d4Bc5a (Wallet ending in Bc5a) |
| Transaction Hash: 0xd094af6d457dcb23f570459035a8a2d609c9609d0e95d4b57a4e152d38d8e86b |
| |
| Date: 03/13/2023 19:37:35 |
| Amount ETH: 43.462973444146385 |
| Sent to wallet address: 0xDa9Fb598bD50582dc179Fc8273627d5fa82F284b (Wallet ending in 284b) |
| Transaction Hash: 0x42412f0d9e5f1683c1fec9a1f9f0f395253bc0d365a67842f1df1665b1a1a11e |
| |
| Date: 03/17/2023 18:16:23 |
| Amount ETH: 1.701174347428773858 |
| Sent to wallet address: 0x40f0119739Bcca77262a753ea1d96fFF1AEfb990 (Wallet ending in b990) |
| Transaction Hash: 0xf210adb3bd33073ac449b0d408e53e47779af2e49dcc2dea805f6bd05675acaf |
| |
| Date: 03/20/2023 18:11:35 |
| Amount ETH: 27.529877747153215 |
| Sent to wallet address: 0x40f0119739Bcca77262a753ea1d96fFF1AEfb990 (Wallet ending in b990) |
| Transaction Hash: 0xbe5b160fb561a0eadf1a33cf7fec61dd101427bf4e14d3af54d2dd3b1e8611a8 |
| |
| Date: 03/22/2023 19:10:59 |
| Amount USDC: 99,250.836329 |
| Sent to wallet address: 0x40f0119739Bcca77262a753ea1d96fFF1AEfb990 (Wallet ending in b990) |
| Transaction Hash: 0x84baa337ed4f366ab9512adfa680dc39d396f9818e38b9d495ecf83319271ab6 |

**Figure 1**

22

| Date: 03/23/2023 18:34:23 |
|---|
| Amount USDT: 29,213.38 |
| Sent to wallet address: 0x40f0119739Bcca77262a753ea1d96fFF1AEfb990 (Wallet ending in b990) |
| Transaction Hash: 0x5e927e25a8e4c4c9a5f527b754577b037866a81611ff007327424dd1fb070499 |
|  |
| Date: 03/24/2023 17:37:47 |
| Amount ETH: 2.792897092423065632 |
| Sent to wallet address: 0x40f0119739Bcca77262a753ea1d96fFF1AEfb990 (Wallet ending in b990) |
| Transaction Hash: 0x5f038260f8fd54f5bc5783e4df83e7ec29899a4013e06654fc58fc6fb9c5f70c |
|  |
| Date: 04/03/2023 17:16:35 |
| Amount USDC: 148.79 |
| Sent to wallet address: 0x839D18e046aef79391f37D6B24f1A83735E0B982 (Wallet ending in B982) |
| Transaction Hash: 0x1ad1ac9f1f5f3327f4f6bba5629c02b5200d24669144afab44b85bfe9ffdbb68 |
|  |
| Date: 04/10/2023 11:36:35 |
| Amount USDC: 26,495.11 |
| Sent to wallet address: 0x40f0119739Bcca77262a753ea1d96fFF1AEfb990 (Wallet ending in b990) |
| Transaction Hash: 0x8b01c7378e7512aac4807ed5f74deed90037135c30dfd93f03778759608af6a6 |
|  |
| Date: 04/10/2023 16:28:59 |
| Amount USDC: 19,529.86 |
| Sent to wallet address: 0x839D18e046aef79391f37D6B24f1A83735E0B982 (Wallet ending in B982) |
| Transaction Hash: 0x81888b378cede8449547fe1b6c6a9871082a7f22e98ee3cb0f4ce9dfc540e13a |
|  |
| Date: 04/11/2023 01:32:47 |
| Amount USDC: 276.75 |
| Sent to wallet address: 0x40f0119739Bcca77262a753ea1d96fFF1AEfb990 (Wallet ending in b990) |
| Transaction Hash: 0x301ea794afae2e1da44c313e11d6b953b3c4b833e79d91dff1cec851024d1d28 |

**Figure 2**

**The Flow of Funds to BINANCE ACCOUNT-1**

76.     After receiving approximately 13.297 ETH of Victim 1's funds, the controller of

wallet address ending in Bc5a remitted the funds to a series of intermediary wallets before a

portion of the victim's funds were converted into approximately 15,000 USDT and ultimately

transferred to the wallet address ending in 847e.  I obtained account records from Binance indicating this transaction corresponds to the BINANCE ACCOUNT-1, as described more fully in the paragraphs below.

77.     A depiction of the transactions to the intermediary wallets involving Victim 1's funds can be found in Figures 3 and 4 below, with times shown in UTC:

| |
|---|
| **Date: 03/11/2023 02:58:23** |
| Amount ETH: 13.29491 |
| Sent to wallet address: 0xa4994e546d0600fc9409a6982590ed047da101df (Wallet ending in 01df) |
| Transaction Hash: 0xbcc21c4f8848cbff0ee2ce776bcef70c8d44a755c50852e201e553c6100f59ef |
| |
| **Date: 03/11/2023 03:10:59** |
| Amount ETH: 13.2972843843873 |
| Sent to wallet address: 0xecd74463bcd50413d071bb9b129564a876d4bc5a (Wallet ending in bc5a) |
| Transaction Hash: 0xd094af6d457dcb23f570459035a8a2d609c9609d0e95d4b57a4e152d38d8e86b |
| |
| **Date: 03/11/2023 03:45:23** |
| Amount USDT: 30000 |
| Sent to wallet address: 0xea46af7912e607efa76ca15f0e4a46e9a08befc5 (Wallet ending in efc5) |
| Transaction Hash: 0xe4ef7d890eb166e37d4ab95c81051633a828b08343c5b20dec6d3adff338b57a |
| |
| **Date: 03/11/2023 07:39:23** |
| Amount USDT: 400000 |
| Sent to wallet address: 0x418ee9fe7382f63f69066645b42172c078227bf5 (Wallet ending in 7bf5) |
| Transaction Hash: 0xc0ebef6063ce240b98458c00dc08acb1861fd5197991bd9dc7bb7a4747fd4a12 |
| |
| **Date: 03/11/2023 09:41:35** |
| Amount USDT: 400000 |
| Sent to wallet address: 0x45891903b963f69566ba229fdaa22bf743b277a0 (Wallet ending in 77a0) |
| Transaction Hash: 0x60af3e2be40704ff2e046187fcb1492bd30ed8ad962313a034cd34c8896bea84 |
| |
| **Date: 03/13/2023 06:54:35** |
| Amount USDT: 70000 |
| Sent to wallet address: 0x9ba7087edbe4b07883e87cfc9ef062265b5f14b6 (Wallet ending in 14b6) |
| Transaction Hash: 0x11ccafd30514d7aa3da9ee4edab25361159f57e1bd513ffff23cd41b015b0571 |
| |
| **Date: 03/16/2023 10:41:35** |
| Amount USDT: 97902 |
| Sent to wallet address: 0x1cbed822e7211ee072df7bb61f90c420f6882af7 (Wallet ending in 2af7) |
| Transaction Hash: 0xa96d9129ba5e7eefdc08427fd0d444330c4f0c09dd79c5a4d1975f1110b67e93 |

**Figure 3**

| |
|---|
| **Date: 03/16/2023 11:50:47** |
| Amount USDT: 149880 |
| Sent to wallet address: 0x3c985892852452fb52537ec1507c105ab356f2e4 (Wallet ending in f2e4) |
| Transaction Hash: 0x07a1e0094a13a5ab4bf4d6c8e77228d791ce609052eb36d85d66449ef9cdb891 |
| |
| **Date: 03/17/2023 08:25:59** |
| Amount USDT: 100000 |
| Sent to wallet address: 0x372f2a3f2793b45480d7e17c47af2f6b934eca9b (Wallet ending in ca9b) |
| Transaction Hash: 0x1dee2cfdea97316bfc9e0738995d76b78c8c6bb198fd33793cbdcd7fd15bafd9 |
| |
| **Date: 03/20/2023 04:44:23** |
| Amount USDT: 300000 |
| Sent to wallet address: 0x372f2a3f2793b45480d7e17c47af2f6b934eca9b (Wallet ending in ca9b) |
| Transaction Hash: 0x02b862011f7cad6475ad3dfa505f26a2e9976ccc14b634fedab1d836ee4414ce |
| |
| **Date: 03/17/2023 08:28:11** |
| Amount USDT: 99704.5 |
| Sent to wallet address: **0xfbaafdca1de0b818623ee01f5950d7f9144b847e** (Wallet ending in **847e**) |
| Transaction Hash: 0xd8eeb24374ef1c2cb8d23a155c9fbc08e1d88da066aff7de1bd688283ea81823 |
| |
| **Date: 03/20/2023 04:46:11** |
| Amount USDT: 299109 |
| Sent to wallet address: **0xfbaafdca1de0b818623ee01f5950d7f9144b847e** (Wallet ending in **847e**) |
| Transaction Hash: 0x162a9968526728f9831a9a05f8823e9706d50fc85b3b51304bbb9c640bffaa8b |

**Figure 4**

78.     A graphic depiction of the transfers identified in Figures 3 and 4 above is

reflected in Attachment A.

### The Flow of Funds to BINANCE ACCOUNT-2

79.     After receiving approximately 32.024 ETH, 126,022.7 USDC, and 29,213.38

USDT of Victim 1's funds, the controller of wallet address ending in b990 remitted the funds to

a series of intermediary wallets before a portion of the victim's funds were converted into

approximately 48,223 USDT and ultimately transferred to the wallet address ending in c365.  I

obtained account records from Binance indicating that this transaction corresponds to the

BINANCE ACCOUNT-2, as described more fully in the paragraphs below.

80.     A depiction of the transactions to the intermediary wallets involving Victim 1's

funds can be seen in Figures 5 and 6 below, with times shown in UTC:

| |
|---|
| **Date: 03/20/2023 18:04:59** |
| Amount ETH: 27.53086 |
| Sent to wallet address: 0xa4994e546d0600fc9409a6982590ed047da101df (Wallet ending in 01df) |
| Transaction Hash: 0x6a77b8917975c9b4bbea8724b0889f134f623804af9bdead307f67a788da6ba6 |
| |
| **Date: 03/20/2023 18:11:35** |
| Amount ETH: 27.5298777471532 |
| Sent to wallet address: 0x40f0119739bcca77262a753ea1d96fff1aefb990  (Wallet ending in b990) |
| Transaction Hash: 0xbe5b160fb561a0eadf1a33cf7fec61dd101427bf4e14d3af54d2dd3b1e8611a8 |
| |
| **Date: 03/20/2023 18:59:35** |
| Amount ETH: 27.5288219514018 |
| Sent to wallet address: 0xd1eac23f14342586a253cf20ac385c2c5c47a6ad (Wallet ending in a6ad) |
| Transaction Hash: 0x978040c854b45899c930ac9ab32983f2f5ba11ed53abf94481461924700376f3 |
| |
| **Date: 03/20/2023 19:06:35** |
| Amount USDT: 48223.316643 |
| Sent to wallet address: 0x509d895eeb156e1a84a86e752af49dbbae09b7e9 (Wallet ending in b7e9) |
| Transaction Hash: 0xdad1e0ae81665363926a3deaca3f842f9aca9baaba7dc079159e5365234b577c |
| |
| **Date: 03/21/2023 08:01:11** |
| Amount USDT: 980810 |
| Sent to wallet address: 0x1f1745da4dd545b932da8c7c896ba43816ee4083 (Wallet ending in 4083) |
| Transaction Hash: 0x8bf45d31ff93dda191a714188ad28c3285026d886a31c5c22b12e27bac86c704 |
| |
| **Date: 03/21/2023 08:10:35** |
| Amount USDT: 1041525 |
| Sent to wallet address: 0x7259996fe607a8806d800da5fb237e6eedcfcfe4 (Wallet ending in cfe4) |
| Transaction Hash: 0x6b51db3ae13df238e05cd9d342470bcc10a33b582a03f44d1546befc049ac04a |
| |
| **Date: 03/21/2023 08:12:59** |
| Amount USDT: 2599693 |
| Sent to wallet address: 0x0a43e49cfb4d5781ecb03f0ae5c64b100de7e2f0 (Wallet ending in e2f0) |
| Transaction Hash: 0x9d23b19d61aee0cbc8e3dc81cb8434465c960ba1aa7225512654ebd8fff5da09 |

**Figure 5**

| Date: 03/21/2023 08:15:47 |
|---|
| Amount USDT: 2600000 |
| Sent to wallet address: 0x8d412d89ecc6cd3b10ec607009e38e1609caeb17 (Wallet ending in eb17) |
| Transaction Hash: 0xf52d31f0e6697d8914563a0c2c5643271f0ff6c5086a3647f8dbfd1dbad21fbd |
| |
| **Date: 03/21/2023 09:25:59** |
| Amount USDT: 300000 |
| Sent to wallet address: 0x7a3bc0e139f3c7f5f675110d6e50330a046e1860 (Wallet ending in 1860) |
| Transaction Hash: 0x34d7f25c21166c756f98674fd960e57a840ddc410c7b39ed7fa73bce4ca29871 |
| |
| **Date: 03/21/2023 12:07:59** |
| Amount USDT: 230000 |
| Sent to wallet address: **0x7ff47be064867cd688b78bda5ed5661cec4fc365** (Wallet ending in **c365**) |
| Transaction Hash: 0xc7ab8934272134769e7cfc676398db78bbf87b576fd5daeee47dbcbac96316ed |

**Figure 6**

81.     A graphic depiction of the transfers identified in Figures 5 and 6 above is reflected in Attachment B.

**Laundering the Fraud Proceeds to the Subject Account**

***Pig Butchering***

82.     As noted above, the scheme detailed in this affidavit is largely consistent with that of a criminal organization employing a burgeoning fraud scheme known as "Pig Butchering." A Pig Butchering scheme often begins with a scammer sending a victim a seemingly misrouted message. From there, the scammer establishes a pattern of communication that evolves into a more personal relationship with the victim, using manipulative tactics similar to those employed in online romance scams.

83.     The victims in Pig Butchering schemes are referred to as "pigs" by the scammers because the scammers often use elaborate storylines to "fatten up" their victims into believing they are in a relationship. Once the victim reaches a certain point of trust, they are then brought

into some version of a cryptocurrency investment scheme and provided fabricated information to bolster the scheme's legitimacy and to help reduce any skepticism the victim might have about the scam.  The fabricated information can include, but is not limited to:

      a.      A fake investment platform held on a website or mobile application that displays fictious investment options.  In reality, the website or application has limited functionality and does not allow the user any access to a cryptocurrency wallet;

      b.      Fabricated investment gains that are displayed on the investment platform website or mobile application.  In actuality, the investment platform does not exist; and,

      c.      A demand to pay the fake investment platform "taxes" or "fees" on the value of the account before they can withdraw funds (and, even when the victims pay these "taxes" or "fees," the victims will be unable to withdraw their funds).

84.      The "butchering" or "slaughtering" of the victim occurs once the victim's assets, or funds, are stolen by the criminal, or criminals, ultimately causing the victim financial and emotional harm.

85.      In this instance, Victim 1 was contacted by three separate online personas who claimed to have investment experience and knowledge of lucrative cryptocurrency-based opportunities.  Based on my knowledge and experience conducting cryptocurrency fraud investigations, I know that criminal organizations often operate in multiple tiers of responsibility. Most often, the individuals that communicate directly with the victim are typically on a lower tier of responsibility in the criminal organization, whereas individuals receiving funds at the end of the scheme are those who profit the most and are typically higher in the criminal organization's hierarchy.  This is largely consistent with the facts of this case as the three

separate online personas claimed to not know the others although they shared similar tactics and two of the personas utilized the same wallet address to receive Victim 1's funds.

86.     Based on my knowledge and experience in investigating cyber fraud schemes, the online personas that contacted Victim 1 are likely not the individuals that the personas portrayed themselves to be but rather personas likely played by more than one person.

87.     Pig Butchering schemes originated in China and law enforcement has determined that criminal organizations utilizing Pig Butchering schemes and tactics more recently have been located in Southeast Asia, including in Hong Kong, Myanmar, Cambodia, Malaysia, Thailand, and Singapore. Further confirming this scheme's connection to Pig Butchering, the persona identified as "IAN" made an admission toward the end of their communication with Victim 1 stating their intention was to defraud Victim 1 in order to transfer victim funds to China.

### *Accessing Binance Accounts from Several Countries*

88.     Binance account records show IP access logs for BINANCE ACCOUNT-1 were accessed by China, Hong Kong, Singapore, Taiwan, and Japan-based IP addresses.  Binance account records show IP access logs for the BINANCE ACCOUNT-2 were accessed by China, Hong Kong, Malaysia, Singapore, Taiwan, Thailand, and Japan-based IP addresses.

89.     A detailed review of access logs for BINANCE ACCOUNT-2 reveals multiple instances of account access from geographically distant IP-based locations within short periods of time.  One such example occurred in February 2023, when account access occurred from a Hong Kong-based IP address and then approximately four minutes later account access occurred from a Malaysia-based IP address.  This further is indicative of money laundering because criminal organizations will often instruct one member of the group set up an account utilizing their identification documentation for KYC to obtain access to the platform account.  Once the

access is obtained, the account will be shared amongst several different devices and with different group members who hold different roles in the criminal organization, much like the use of a money mule.

90.     A review of the transactions containing victim funds demonstrate that the members of the organization who had control over the provided wallets displayed tactics typically used in money laundering transactions and did so for the purpose of attempting to conceal the origin of the fraud proceeds.  Specifically, the fraudsters converted victim funds from the original cryptocurrency, Ether (ETH), into a different cryptocurrency, Tether (USDT).  This conversion is known as "Chain-Hopping."

*Transaction History, Fund Movement, and Connection to Other Victims*

91.     A further review of the transactions made by Victim 1 and the movement of these funds into the BINANCE ACCOUNTS show additional tactics typically employed in money laundering transactions, used for the purpose of attempting to conceal the origin of the fraud proceeds.  In this case, the fraudsters obfuscated linear lines of blockchain transactions, separated victim proceeds, and co-mingled Victim 1's funds with other funds of unknown origin.  The following summary shows deposits into each target account containing Victim 1's funds and the amount of victim funds contained within each deposit:

a)     BINANCE ACCOUNT-1 received two deposits totaling 398,813.50 USDT, which contained approximately 15,000 USDT in proceeds from the fraud of Victim 1; and

b)     BINANCE ACCOUNT-2 received one deposit totaling 230,000 USDT, which contained approximately 48,223 USDT in proceeds from the fraud of Victim 1.

92.     The organization controlling the movement of fraud proceeds between these accounts utilized private wallet addresses for the token movements, which is also indicative of money laundering tactics used to conceal and disguise the source of originating victim funds. Private wallets are non-custodial wallets, meaning that the owner, as opposed to the host, controls the private keys and therefore all associated funding—all without institutional oversight or financial regulation. Private, non-custodial wallets can be held in numerous forms such as wallet applications on computers and cell phones, cold storage devices not connected to the internet, and paper wallets.

93.     Additionally, the number of "hops" in these transactions appear to lack any ostensible business purpose and the fact that several hops occurred in rapid succession further establishes probable cause to believe that the transfers were coordinated and intended to obscure the control, ownership, source, and purpose of the funds involved in said transfers. A detailed review of the flow of funds from the victim to BINANCE ACCOUNT-2 shows the victim funds made 10 transfers or "hops" within approximately 18 hours.

94.     A search of law enforcement databases yields a fraud report associated with one of the intermediary wallets that transferred Victim 1's funds to BINANCE ACCOUNT-1.

95.     As illustrated in Attachment C, Victim 1's funds were traced through nine intermediary wallets, or "hops," before arriving at TARGET ACCOUNT-2. The USSS performed analyses on each of the hops and repeatedly located reports of additional fraud. USSS determined that these nine intermediary wallets and TARGET ACCOUNT-2 were connected to approximately $5,480,397.83 of losses reported by 36 other scam victims within the United States.

96.     More specifically, USSS investigation revealed that: wallet address ending in a6ad had interacted with wallet addresses where, six hops earlier, one victim reported being the victim of a pig butchering scam and had deposited cryptocurrency into a connected address. Wallet address ending in b7e9 had interacted with wallet addresses where, five hops earlier, two victims reported being the victims of a pig butchering scam and had deposited cryptocurrency into a connected address.  Wallet address ending in cfe4 had interacted with wallet addresses where four hops and five hops earlier five victims reported having deposited cryptocurrency into an address as the victim of scams including pig butchering.  Wallet address ending in e2f0 had interacted with wallet addresses where five hops earlier one victim reported having deposited cryptocurrency into an address as the victim of a scam.  Wallet address ending in eb17 had interacted with wallet addresses where four and five hops earlier three victims reported having deposited cryptocurrency into an address as the victim of scams including pig butchering. Wallet address ending in 1860 had interacted with wallet addresses where five hops earlier three victims reported having deposited cryptocurrency into an address as the victim of scams including pig butchering.  BINANCE ACCOUNT-2 had interacted with wallet addresses where four and five hops earlier 16 victims reported having deposited cryptocurrency into an address as the victim of scams including pig butchering.

97.     These 36 victims collectively reported losses of approximately $5,480,397.83, as shown with additional detail in the figure below.

| Victim | City/State | Loss | Address |
|---|---|---|---|
| Victim 2 | Rosemead, CA | $348,334.39 | 0x0577...97a4 |
| Victim 3 | Sunnyvale, CA | $170,000.00 | 0xb0e3...e55a |
| Victim 4 | Chicago, IL | $1,410,000.00 | 0xb0e3...e55a |
| Victim 5 | Carmel, Indiana | $859.10 | 0xcc45...614e |
| Victim 6 | Danbury, CT | $500.00 | 0x7052...4e7d |
| Victim 7 | Mcadoo, PA | $86,000.00 | 0x7102...becd |
| Victim 8 | Ankeny, IA | $7,047.65 | 0x81cc...e051 |
| Victim 9 | Barre, VT | $103,000.00 | 0xb7b2...c6fa0 |
| Victim 10 | Westminster, CA | $321,500.00 | 0xf64e...aac6 |
| Victim 11 | Arrington, TN | $267,814.88 | 0x90f5...82e9 |
| Victim 12 | Taylorsville, UT | $102,000.00 | 0x90f5...82e9 |
| Victim 13 | North Attleboro, MA | $5,272.75 | 0xd889...1a69 |
| Victim 14 | Galloway, OH | $20,000.00 | 0x6302...9742 |
| Victim 15 | Millbrae, CA | $56,990.00 | 0x6302...9742 |
| Victim 16 | Los Angeles, CA | $60,694.00 | 0x6302...9742 |
| Victim 17 | Lewisville, TX | $3,285.00 | 0x6302...9742 |
| Victim 18 | Minneapolis, MN | $9,681.59 | 0x6302...9742 |
| Victim 19 | Alameda, CA | $2,267.66 | 0x6302...9742 |
| Victim 20 | Medford, MA | $11,664.16 | 0x6302...9742 |
| Victim 21 | Spring, TX | $18,722.00 | 0x6302...9742 |
| Victim 22 | Windemere, FL | $8,064.00 | 0x0645...c848 |
| Victim 23 | Bellevue, WA | $500,000.00 | 0x0645...c848 |
| Victim 24 | Montgomery Village, MD | $8,631.41 | 0x0645...c848 |
| Victim 25 | Riverside, CA | $100,258.84 | 0x0645...c848 |
| Victim 26 | Valdosta, GA | $34,590.00 | 0x0645...c848 |
| Victim 27 | Temecula, CA | $50,315.49 | 0x0645...c848 |
| Victim 28 | Austin, TX | $6,111.86 | 0x0645...c848 |
| Victim 29 | Kent, WA | $3,855.44 | 0x0645...c848 |
| Victim 30 | San Jose, CA | $973,483.48 | 0x0645...c848 |
| Victim 31 | San Francisco, CA | $281,149.10 | 0x0645...c848 |
| Victim 32 | Hayward, CA | $57,442.07 | 0x0645...c848 |
| Victim 33 | Colleyville, TX | $15,724.35 | 0x0645...c848 |
| Victim 34 | Seattle, WA | $241,446.00 | 0x0645...c848 |
| Victim 35 | Rosenberg, TX | $79,000.00 | 0x0645...c848 |
| Victim 36 | Nashville, TN | $78,320.36 | 0xb705...149d |
| Victim 37 | Chicago, IL | $9,957.88 | 0xb705...149d |
|  |  |  |  |

**Figure 7**

**Analysis of the Subject Accounts**

98.     After reviewing the graphic depiction of transfers shown in Attachment A and other facts of this investigation, I was able to identify that, after multiple intermediary transfers, a total of approximately 15,000 USDT worth of victim funds, the proceeds of wire fraud, were ultimately transferred to wallet address ending in 847e (as described in the above paragraphs and as depicted in Figures 3 and 4 and Attachment A) and were then laundered within, and layered into, 2 separate deposits totaling 398,813.50 USDT.  I contacted Binance for information associated with these victim transactions into wallet address ending in 847e and obtained account records for one Binance account, with User ID 84103903, held in the name of WAI MAN CHIU. This account is also known as the BINANCE ACCOUNT-1.  The records include the email address chiuidy3@yahoo.com.hk and a Hong Kong ID bearing the name WAI MAN CHIU.  The BINANCE ACCOUNT-1 was opened on or about February 19, 2021.  At the time of seizure, the BINANCE ACCOUNT-1 held approximately 299,457.4 USDC, 162.5354 USDT, and 6,941.648 TRX, along with small amounts of other cryptocurrencies.

99.     Of the amount held in the BINANCE ACCOUNT-1, the Government seized 299,457.4 USDC, 162.5354 USDT, and 6,941.648 TRX.  As stated above, 15,000 USDT is traceable to the proceeds of wire fraud and represents those funds transferred from Victim 1. The additional funds that the Government seized and is seeking to forfeit have been co-mingled with fraud proceeds and are therefore property involved in money laundering or property traceable to such property.

100.     After reviewing the transfers shown in Attachment B and other facts of this investigation, I was able to identify that, after multiple intermediary transfers, a total of approximately 48,223 USDT worth of victim funds, the proceeds of wire fraud, were ultimately

transferred to wallet address ending in **c365** (referenced in paragraphs above and depicted in Figures 5 and 6 and Attachment B) and then laundered within, and layered into, a deposit totaling 230,000 USDT.  I contacted Binance for information associated with this victim transaction associated with wallet address ending in **c365** and obtained account records for one Binance account, with User ID 88677849, held in the name of CHEW JA ZHENG.  This account is also known as the BINANCE ACCOUNT-2.  The records include an email address andrewchew700@gmail.com and a Malaysia ID containing the name CHEW JA ZHENG.  The BINANCE ACCOUNT-2 was opened on or about February 25, 2021.  At the time of seizure, the BINANCE ACCOUNT-2 held approximately 1,455,143.462248 USDT, 3,032.1689461 SOL, 67.79400436 BNB, 95,336.8670150 TRX, 13,703.955431 ADA, and 0.54151495 ETH, along with small amounts of other cryptocurrencies.

101.    Of the amount held in the BINANCE ACCOUNT-2 at the time of seizure, the Government is seeking to forfeit all USDT, SOL, BNB, TRX, ADA, and ETH that have been seized.  As stated above, 48,223 USDT is traceable to proceeds of wire fraud and represents those funds transferred from Victim 1.  The additional funds that the Government is seeking to forfeit have been co-mingled with fraud proceeds and are therefore property involved in money laundering or property traceable to such property.

102.    Based on the above analysis, and my training and experience, I have probable cause to believe that all USDC, USDT, and TRX seized from the BINANCE ACCOUNT-1 and all USDT, SOL, BNB, TRX, ADA, and ETH seized from the BINANCE ACCOUNT-2 represent the proceeds of wire fraud in violation of 18 U.S.C. § 1343 and/or are funds involved in money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and (h) and are subject to forfeiture.

## CONCLUSION

103.    Based on my knowledge, training, and experience, and the foregoing information set forth in this affidavit, there is probable cause that: (a) all USDC, USDT, and TRX seized from an account with user ID XXXX3903 at BINANCE in the name of WAI MAN CHIU; and (b) all USDT, SOL, BNB, TRX, ADA, and ETH seized from an account with user ID XXXX7849 at BINANCE in the name of CHEW JA ZHENG are proceeds traceable to violations of 18 U.S.C. § 1343 (wire fraud) and/or funds involved in money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and (h) and are subject to forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A and (C).


Pursuant to 28 U.S.C. § 1746, I declare under the penalties of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.  Executed this 13 day of March, 2024.

_____
Cyber Special Agent Garrett FitzGerald Jr.
United States Secret Service